IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


WILLIAM SAMUEL THOMA, SR.,  )
Plaintiff,  )
  )
    vs.  ) Civil Action No. 13-1682
  )
  ) Judge Nora Barry Fischer
CAROLYN W. COLVIN,[1]  ) Chief Magistrate Judge Maureen P. Kelly
Acting Commissioner of  )
Social Security Administration,  ) Re: ECF Nos. 12, 14
Defendant.  )


**REPORT AND RECOMMENDATION**


I.    **RECOMMENDATION**

Plaintiff, William Samuel Thoma, Sr. ("Plaintiff"), brought this action pursuant to 42

U.S.C. § 405(g), seeking review of the Commissioner of Social Security's final decision denying

his claim for disability insurance benefits ("DIB") and supplemental security income ("SSI")

under Titles II and XVI of the Social Security Act ("the Act"), 42 U.S.C. § 401-433, 1381-1383f.

Pending before the Court are the parties' cross-motions for summary judgment. (ECF Nos. 12,

14). It is respectfully recommended that the Motion for Summary Judgment filed by Plaintiff

(ECF. No. 12) be denied and the Motion for Summary Judgment filed by Defendant (ECF No.

14) be granted.

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Defendant has consented to the substitution of Carolyn W. Colvin as the defendant in this suit. See also 42 U.S.C. § 405(g).

## II.    REPORT

### A.    Procedural History

Plaintiff protectively filed his application for DIB on April 1, 2011, and his application

for SSI on November 11, 2011, alleging disability since October 25, 2011, due to

hemochromatosis, irregular heartbeat, high blood pressure, anxiety, dizziness, fainting spellings,

acid reflux and bleeding ulcers.  (R. 181-198).  Plaintiff's applications for benefits were denied

by Pennsylvania Bureau of Disability Determination on May 21, 2012; thereafter, Plaintiff

requested a hearing before an administrative law judge.  (R. 5-6, 111-20).  On April 25, 2013,

Plaintiff, represented by counsel, and Karen S. Krull, an impartial vocational expert ("VE"),

testified at the hearing before Administrative Law Judge James J. Pileggi ("the ALJ").  (R. 31-

71).

On June 7, 2013, the ALJ issued his decision finding that Plaintiff could perform limited

unskilled sedentary work existing in significant numbers in the national economy, and therefore,

Plaintiff was not disabled under the Act.  (R. 23).  The Appeals Council denied Plaintiff's

request for review.  (R. 1-4). On November 25, 2013, Plaintiff initiated this action seeking

judicial review of the ALJ decision.  (R. 1-3).

### B.    Factual Background

#### 1. Medical History

Plaintiff alleged disability stemming from hemochromatosis, irregular heartbeat, high

blood pressure, anxiety, dizziness, fainting spellings, acid reflux and bleeding ulcers with an

alleged onset date of October 25, 2011.  Plaintiff's relevant treatment records reveal that none of

the cited impairments are so severe as to preclude substantial gainful employment.

Over six months prior to Plaintiff's alleged disability onset date, Plaintiff visited Butler Memorial Hospital with symptoms related to pancreatitis. (R. 436). Treatment notes indicate that Plaintiff suffered from ongoing alcohol abuse and dependency. (R. 436). Plaintiff underwent a psychiatric consultation regarding his alcoholism and admitted that, while he was not currently being treated for his alcoholism, he previously attended rehabilitation and underwent detoxification. (R. 436). Plaintiff drank eight to ten drinks each day, which he did not consider "that much." (R. 436). Plaintiff was not interested in seeking rehabilitative treatment. (R. 436-37). During his examination, Plaintiff's alcohol level measured at .366. (R. 437). He appeared inattentive and explained that he suffers from hallucinations. (R. 437). However, Plaintiff did not report any major mood symptoms. (R. 437).

A week later, on March 22, 2011, Plaintiff again sought treatment at Butler Memorial Hospital and was admitted with acute GI symptoms. (R. 434). During his hospitalization, Plaintiff underwent detoxification for alcohol and Ativan, and appeared disoriented and confused. (R. 434). On March 24, 2011, against medical advice, Plaintiff left the hospital. (R. 434). He refused to fill out discharge paperwork and his detoxification attempt was deemed unsuccessful. (R. 434).

On April, 18, 2011, Plaintiff followed-up with his general care physician, John Rocchi, M.D. (R. 278). Plaintiff reported that he had stopped drinking alcohol and had not experienced any withdrawal symptoms. (R. 278). He stated that his Ativan prescription "worked well" and he only took one pill each day. (R. 278). Dr. Rocchi diagnosed Plaintiff with alcohol dependency, epigastric pain and hypertension. (R. 279). During Plaintiff's June 23, 2011, appointment, Plaintiff complained of feeling jittery and anxious. (R. 277). Dr. Rocchi prescribed Zoloft and Ativan to treat anxiety and ordered Plaintiff to follow-up in a month. (R.

277). During a July 21, 2011, appointment, Dr. Rocchi continued Plaintiff's Zoloft and Ativan prescriptions. (R. 267, 269).

Plaintiff was hospitalized at Butler Memorial Hospital on October 14, 2011, after he experienced dizziness and lightheadedness and was diagnosed with atrial fibrillation. (R. 416). During his hospitalization, his doctors questioned whether Plaintiff had quit drinking, although he reported doing so. (R. 421). Plaintiff acted anxiously and appeared as if he was experiencing withdrawal. (R. 422). On October 18, 2011, upon discharge from the hospital, Plaintiff followed-up with Dr. Rocchi who continued to prescribe Ativan and Zoloft. (R. 271, 273).

On November 16, 2011, Plaintiff again visited Dr. Rocchi and complained of stomach pains, leg numbness and back and leg pain. (R. 351). Plaintiff had not experienced any recent chest pains, but became sweaty during the night. (R. 351). Plaintiff underwent a spine lumbosacral examination which revealed wedge deformities and mild disc space narrowing. (R. 355). On November 23, 2011, Plaintiff had an MRI performed of his lumbar spine demonstrating mild disc space narrowing, but no evidence of focal disc protrusion or stenosis was identified. (R. 507).

Plaintiff returned to Dr. Rocchi for a follow-up appointment on January 24, 2012. Plaintiff reported that he had sought drug and alcohol addiction treatment and had been hospitalized from January 3, 2012, through January 8, 2012. (R. 534). During his inpatient hospitalization, Plaintiff was also treated for depression and prescribed an antidepressant. However, Plaintiff noted he was no longer taking the medication. (R. 534). During his appointment, Plaintiff complained of low back pain which radiated into his legs and right elbow and shoulder pain. (R. 534). Plaintiff could lift his arms over his head, but explained that he had difficulty bending, squatting, and sitting or standing for prolonged periods of time. (R. 534).

On January 25, 2012, Dr. Rocchi completed a Department of Public Welfare Employability Assessment and after briefly listing Plaintiff's complaints of leg pain and numbness, Dr. Rocchi checked a box indicating that Plaintiff was temporarily disabled for a period of one year. Dr. Rocchi or his staff listed diagnoses of depression, atrial fibrillation and low back pain, but did not provide any information regarding the basis for his opinion, such as an examination, review of Plaintiff's clinical history or ongoing treatment. (R. 673). Dr. Rocchi also indicated that Plaintiff required Zoloft to treat his depression so that he could work in some capacity.

Plaintiff sought pain management from Mark R. LoDico M.D., on February 14, 2012, and complained of pain all over. (R. 657). Plaintiff rated the pain as an eight out of ten and reported that heat treatment, Vicodin, OxyContin, and Tylenol provided partial relief. (R. 657). Plaintiff arrived at the appointment unaccompanied and could walk and squat with minimal difficulty. (R. 658). He had full muscle strength and range of motion in his extremities. (R. 658). Following referral by Dr. Rocchi, Plaintiff saw Devashis Mitra, M.D., on February 22, 2012, for Plaintiff's joint and low back pain. (R. 526). Dr. Mitra's examination revealed that Plaintiff had no inflammation in his upper and lower extremities, but experienced some tenderness in his spine and crepitus movement in both knees. (R. 527). Plaintiff's knee x-rays were unremarkable and his sacroiliac joints, wrist and hand x-rays revealed normal findings. (R. 559-65). Plaintiff's right foot showed signs of early osteoarthritis and his left foot showed signs of possible early gouty arthritis. (R. 566-67).

On February 23, 2012, Plaintiff returned to Dr. LoDico with continued complaints of pain and Dr. LoDico administered a lumbar epidural steroid injection. (R. 654-55). On March 16,

2012, Plaintiff underwent additional steroid injections. (R. 649). Plaintiff reported that the steroid injections relieved his pain for eight days. (R. 626).

On March 29, 2012, Plaintiff saw Robert Waltrip, M.D. at Tri-Rivers Surgical Associates for an evaluation of his right shoulder. (R. 592). Dr. Waltrip noted no gross abnormality or tenderness and indicated that Plaintiff maintained good motion and strength. (R. 592). Overall, Dr. Waltrip opined that Plaintiff likely suffered bursitis in his shoulder, but would not prescribe pain medication. (R. 592). Instead, Dr. Waltrip recommended steroid injections, home exercise and over-the-counter pain medication. (R. 592).

On April 26, 2012, during a pain management appointment, Plaintiff complained of lower back pain in his right side and rated it as a ten out of ten. (R. 643). Dr. LoDico again administered steroid injections. (R. 644). On May 7, 2012, Plaintiff returned with continued complaints of back pain. (R. 641). Plaintiff attended the appointment unaccompanied and could rise from a seated position without assistance. (R. 642). Due to Plaintiff's history of addiction, Dr. LoDico noted that Plaintiff was not a candidate for narcotic therapy to relieve his pain. (R. 642). During the appointment, Plaintiff smelled of alcohol. (R. 642).

In July 2012, Plaintiff fell while in the shower. (R. 55-57). His accident resulted in an open wound, pain and numbness in his right hand. (R. 727). On August 2, 2012, Plaintiff saw Dr. Rocchi and reported that he had fallen in the bathroom. (R. 727). Plaintiff next saw Dr. Rocchi five months later, on January 31, 2013. Plaintiff complained of stomach pain lasting a month. (R. 723). Plaintiff indicated that he felt depressed, continued to drink alcohol, and had not been able to work due to his hand. (R. 723). Dr. Rocchi prescribed Zoloft for Plaintiff. (R. 725).

In February 2013, Plaintiff underwent surgery for his right wrist injury that stemmed from his previous fall in the bathroom. (R. 732). His surgeon, H. James Pfaeffle, M.D., recommended that Plaintiff attend therapy for active range of motion and avoid gripping for six to eight weeks. (R. 732). Post-surgery, Dr. Pfaeffle found that, as of March 20, 2013, Plaintiff's wounds healed, sensation returned to his finger, and he could pinch his thumb and index finger together. (R. 735).

On March 4, 2013, Plaintiff had an appointment with Dr. Rocchi. (R. 718). Plaintiff provided an update as to his hand surgery. He also conveyed that he felt depressed because of his recent divorce. (R. 718). Plaintiff thought that the Zoloft helped his depression and explained that he sought out a counselor, but had not yet scheduled an appointment. (R. 718).

Dr. Rocchi referred Plaintiff to James A. Craig Jr., D.O., at Tri-Rivers Surgical Associates for a consultation regarding his back pain. On March 18, 2013, and Plaintiff reported to Dr. Craig that his previous steroid injections and Vicodin relieved his pain. (R. 737). Dr. Craig took over Plaintiff's pain management and had Plaintiff sign a narcotics agreement. (R. 737). He also prescribed physical therapy.

### 2. Function Report

On November 11, 2011, Plaintiff completed a Social Security Administration Function Report in conjunction with his application for benefits. Plaintiff indicated that he lived in a house with his family, and helped care for his wife and his son. (R. 235). He spent his days eating, relaxing and taking his medications. (R. 236.) Plaintiff complained of experiencing shortness of breath, numbness and shaking in his legs and feet, dizziness which resulted in an inability to focus, blurred vision and stomach problems. (R. 235). He also noted that his

depression and anxiety affected his ability to sleep. (R. 235-36). Plaintiff had no difficulty tending to his personal needs. (R. 236).

Plaintiff did not prepare his own meals, but could perform most household chores. (R. 237). He went outside to get fresh air and would ride in a car. (R. 238). He did not drive and could not go out alone, because he experienced dizziness. (R. 238). He regularly went food shopping without needing reminders and without needing someone to accompany him. (R. at 239). He could pay bills, count change and use a checkbook. (R. 238).

Plaintiff listed reading and watching television as his hobbies and he indicated that he participated in these activities daily. (R. 239). Plaintiff spent time with others talking, having fun and relaxing. (R. 239). Plaintiff marked that his conditions affected his ability to lift, walk, see, remember and use his hands, but did not affect his ability to squat, bend, stand, reach, sit, kneel, talk, hear, climb stairs, complete tasks, concentrate, understand, follow instructions and get along with others. (R. 240). He could walk "far" sometimes. (R. 240). Plaintiff reported that he manages well with authority figures and has never been fired from a job because of problems getting along with others. (R. 241). He indicated that he can handle stress and changes in his routine. (R. 241).

### 3. Functional Capacity Evaluations

On February 7, 2012, Mohammad K. Malik, M.D., completed a consultative examination of Plaintiff and determined that Plaintiff maintains the ability to lift and carry ten pounds frequently and twenty pounds occasionally. (R. 547). Further, Plaintiff is able to stand and walk or sit for four hours and has no limitation on his ability push or pull. (R. 547). Dr. Malik opined that Plaintiff can frequently bend and kneel, and occasionally stoop, crouch, balance and climb. (R. 547). Dr. Malik found that while Plaintiff should avoid heights and moving machinery, he

has no other physical limitations. (R. 548). Dr. Malik made similar findings in March 2012 and noted Plaintiff's alcohol abuse. (R. 599-606).

On April 5, 2012, Kerry Brace, Psy.D., completed a Disability Determination Explanation regarding Plaintiff's Mental Residual Functioning Capacity ("RFC"). (R. 72-85). After reviewing Plaintiff's medical records, Dr. Brace opined that Plaintiff does not have medically determinable mental impairments. (R. 78-79). In making this determination, Dr. Brace opined that Plaintiff has mild restrictions of activities of daily living and moderate difficulties in maintaining social functioning and concentration, persistence or pace. (R. 79). Plaintiff does not experience repeated episodes of extended decompensation. (R. 79). Dr. Brace found Plaintiff's statements partially credible and noted that Plaintiff indicated that his mental health did not interfere with his employment. (R. 79).

Dr. Brace concluded that Plaintiff experiences moderate limitations in his ability to understand and remember detailed instructions, carry out detailed instructions, interact appropriately with the general public and socialize appropriately with coworkers or peers without distracting them or exhibiting behavioral extremes. (R. 82-85). However, Dr. Brace further opined that Plaintiff has no significant limitation in his ability to remember locations and work-like procedures, understand and remember short and simple instructions, carry out very short and simple instructions, perform activities with a schedule and maintain regular attendance and punctuality, sustain an ordinary routine without supervision, work in coordination with or in proximity to others without being distracted by them, make simple work-related decisions, complete a normal workday and workweek without interruptions from psychological symptoms and perform at a consistent pace without unreasonable breaks, ask simple questions or request

assistance, accept instructions and respond to supervisors, and maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. (R. 82-85).

On March 21, 2012, Julie Uran, Ph.D., conducted a consultative examination and diagnosed Plaintiff with depression and generalized anxiety disorder. (R. 579-82). During the examination, however, Plaintiff reported that his emotional health would not interfere with his employment and he felt "fair" during the evaluation. (R. 579-80). Dr. Uran assigned Plaintiff a global assessment functioning ("GAF") score of 60.[2] (R. 582). Plaintiff reported that he had no problem shopping, grooming, cooking, using public transportation, getting along with others, dealing with authority or initiating social contact. (R. 583-85). However, he did not feel like cleaning, relied on others for paying bills and had no interest in group activities. (R. 585).

Similar to Dr. Brace, Dr. Uran opined that Plaintiff had no impairment in understanding and remembering short simple instructions, carrying out short simple instructions and interacting appropriately with supervisors. (R. 586). Plaintiff experienced only a slight limitation in his ability to make judgments on simple work-related decisions and respond appropriately to changes in a work setting. (R. 586). Dr. Uran further opined that Plaintiff was moderately restricted in his ability to understand and detailed instructions, interact appropriately with the public and with co-workers and respond appropriately to work pressures in a usual setting. (R. 586). Dr. Uran attributed Plaintiff's limitations to his depression, anxiety and learning problems. (R. 586). Overall, Dr. Uran determined that Plaintiff could manage benefits in his own best interest. (R. 587).

---

[2] The GAF Scale assesses an individual's psychological, social and occupational functioning with a score of 1 being the lowest and a score of 100 being the highest. The GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders (DSM–IV–TR) 34 (4th ed. 2000). An individual with a GAF score of 51–60 may have "[m]oderate symptoms" or "moderate difficulty in social, occupational, or school functioning." Id.

On May 3, 2012, V. Rama Kumar, M.D., completed a physical RFC assessment of Plaintiff and opined that Plaintiff could occasionally lift and/or carry twenty pounds and frequently lift and/or carry ten pounds. (R. 81). Plaintiff could stand and walk for about six hours and sit for about six hours in an eight hour work day. (R. 81). His ability to push and/or pull was unlimited. (R. 81). Plaintiff could occasionally climb ramps, stairs, ladders, ropes and scaffolds, balance, stoop, kneel, crouch and crawl. (R. 81). He experienced no manipulative, visual or communicative limitations, but needed to avoid even moderate exposure to extreme cold, extreme heat, wetness, humidity, fumes, odors, dusts, gases and poor ventilation. (R. 82).

### 4. Testimony at ALJ Hearing

The hearing before the ALJ took place on April 25, 2013. Plaintiff testified that he was 49 years old and divorced. (R. 36). He did not graduate high school and did not have a current driver's license. (R. 36-37). He previously held a driver's license, but it was suspended due DUI charges. (R. 50). While Plaintiff reported having alcohol problems in the past, he stated he has not experienced those problems since his alleged onset date. (R. 38). Plaintiff was previously employed as a butcher, but has not worked since October 25, 2011. (R. 37).

Regarding his mental condition, Plaintiff testified that he has not seen a psychiatrist, but attended therapy twice. (R. 39). Plaintiff's primary care physician prescribed depression medication to Plaintiff. (R. 39). Plaintiff indicated that that the medication was helpful in treating his condition. (R. 39). He testified that his depression and anxiety caused him to experience suicidal thoughts and tremors. (R. 52).

Plaintiff wore a brace on his right, non-dominant arm during the hearing. (R. 39, 41). He had been wearing the brace for the past two months to tend to an injury that occurred when he slipped getting out of the shower. (R. 40). His injury resulted in cuts and Plaintiff testified that

he underwent surgery to repair tendons.  (R. 41).  Plaintiff also attended physical therapy.  (R. 41).  He could not make a fist, take a lid off of a jar, hold eating utensils, but could pick up small objects.  (R. 42-43).  While Plaintiff maintained use of his right thumb and forefinger, he experienced numbness in the rest of his hand and struggled to tie his shoelaces.  (R. 42-43).  Plaintiff complained that his right arm was "always in pain."  (R. 47).  Regarding Plaintiff's left, dominant hand, Plaintiff testified that he would need to undergo carpel tunnel surgery.  (R. 44).  However, Plaintiff had not scheduled the surgery at the time of the hearing.  (R. 45).

Plaintiff testified that he suffered from fainting spells, typically in the mornings and, on one occasion, he lost consciousness.  (R. 45).  Plaintiff attributed his fainting spells to his irregular heartbeat.  (R. 46).  Plaintiff went into the hospital for his heart problem in October 2011.  (R. 46).  Plaintiff further explained that he experienced back pain.  (R. 47).  He received injections in his back, which relieved the pain for a period of time.  (R. 47).  Plaintiff thought that he would "possibly" need to undergo back surgery.  (R. 48).  Plaintiff also experienced pain is his right ankle and foot once or twice each week.  (R. 55). This pain stemmed from a broken ankle in 2010, which required reconstructive surgery.  (R. 55).   Plaintiff's ankle pain increased when standing.  (R. 55).   He also mentioned that he uses an inhaler, has problem with his lungs, suffered from a blood condition and experiences migraines.  (R. 62).

Plaintiff estimated that he could stand on his feet for about half an hour before needing to sit or lay down.  (R. 48).  He could walk for approximately thirty minutes before needing to hold on to something because he would get dizzy.  (R. 48).  Plaintiff could sit for about an hour before needing to stand up and could lift about eight pounds.  (R. 48-49).  He explained that he needed to lie down with his legs up for about three to four hours at a time to alleviate his back and leg pain.  (R. 59).  He could tend to his personal needs and perform some housework, including

washing his dishes and clothes. (R. 49). Plaintiff's neighbor mowed his lawn, but Plaintiff could use his weed eater. (R. 49). Plaintiff spent time by himself or visiting with neighbors. (R. 50).

Following Plaintiff's testimony, the VE testified briefly. The ALJ asked the VE whether a hypothetical person of Plaintiff's age, educational, work experience and with the ability to perform sedentary work, but with the inability to crawl, kneel, squat, climb, balance, operate dangerous machinery and vehicles, or work in an atmosphere concentrated with airborne pollutants, could perform jobs that existed in the national economy. (R. 65). The VE testified that such a person could work as a document preparer with 25,000 positions available in the national economy, an assembler with about 50,000 positions available, a ticket seller with about 40,000 jobs available in the national economy and an alarm/surveillance system monitor with about 10,000 jobs available. (R. 65-66). All of these jobs, except the assembler position, could be performed with a "sit/stand option" or with limited use of a non-dominate hand. (R. 66-67). Further, the VE testified that being off task during 10 to 15 percent the workday would preclude an individual from performing the above jobs or any jobs that existed in that nationally economy. (R. 67).

In response to questioning by Plaintiff's counsel, the VE indicated that an individual who missed more than one day of work per month would not be able to keep their job. (R. 69). Further, a person that needed to lay down to take a break for more than an hour and forty minutes per day would not be able to engage in substantial employment. (R. 70).

### C. Standard of Review

To be eligible for Social Security benefits under the Act, a claimant must demonstrate to the Commissioner that he or she cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death

or which has lasted or can be expected to last for a continuous period of at least twelve months. 42 U.S.C. § 423(d)(1)(A); <u>Brewster v. Heckler</u>, 786 F.2d 581, 583 (3d Cir. 1986). When reviewing a claim, the Commissioner must utilize a five-step sequential analysis to evaluate whether a claimant has met the requirements for disability. 20 C.F.R. §§ 404.1520, 416.920.

The Commissioner must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, App'x 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy. 20 C.F.R. §§ 404.1520(a) (4), 416.920(a)(4); <u>see</u> <u>Barnhart v. Thomas</u>, 540 U.S. 20, 24–25 (2003). If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given claimant's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. <u>Doak v. Heckler</u>, 790 F.2d 26, 28 (3d Cir. 1986).

Judicial review of the Commissioner's final decisions on disability claims is provided by statute, and is plenary as to all legal issues. 42 U.S.C. §§ 405(g),[3] 1383(c)(3);[4] <u>Schaudeck v.</u>

---

[3] Section 405(g) provides in pertinent part:

> Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action ... brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business

42 U.S.C. § 405(g).

[4] Section 1383(c)(3) provides in pertinent part:

Comm'r of Soc. Sec., 181 F.3d 429, 431 (3d Cir. 1999). Section 405(g) permits a district court to review the transcripts and records upon which a determination of the Commissioner is based; the court will review the record as a whole. See 5 U.S.C. § 706. The district court must then determine whether substantial evidence existed in the record to support the Commissioner's findings of fact. Burns v. Barnhart, 312 F.3d 113, 118 (3d Cir. 2002).

Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate" to support a conclusion. Ventura v. Shalala, 55 F.3d 900, 901 (3d Cir. 1995) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). If the Commissioner's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); Richardson, 402 U.S. at 390. When considering a case, a district court cannot conduct a de novo review of the Commissioner's decision nor re-weigh the evidence of record; the court can only judge the propriety of the decision in reference to the grounds invoked by the Commissioner when the decision was rendered. Palmer v. Apfel, 995 F. Supp. 549, 552 (E.D.Pa. 1998); S.E.C. v. Chenery Corp., 332 U.S. 194, 196–97 (1947). The court will not affirm a determination by substituting what it considers to be a proper basis. Chenery, 332 U.S. at 196–97. Further, "even where this court acting de novo might have reached a different conclusion ... so long as the agency's fact-finding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings." Monsour Medical Center v. Heckler, 806 F.2d 1185, 1190–91 (3d. Cir. 1986).

---

The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided i n section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.
42 U.S.C. § 1383(c)(3).

**D.      Discussion**

Based upon the record in this case, the ALJ found, at step two of the analysis, that Plaintiff experienced medically determinable severe impairments of lumbar spine degenerative disc disease, lumbar myofascial pain, history of thoracic vertebrae fracture, carpel tunnel syndrome, joint pain, osteoarthritis, status post right hand lacerations and surgeries, sleep apnea, chronic obstructive pulmonary disease, hemochromatosis, hypertension, atrial fibrillation, epigastric abdominal pain, esophagitis and alcohol abuse.  (R. 12).  The ALJ noted that Plaintiff's depression and generalized anxiety disorder were non-severe.  (R. 13).  While making this determination, the ALJ considered the four broad functional areas for evaluating a mental disorder.  (R. 13).   While the ALJ found that Plaintiff had no limitations in activities in daily living and social functioning, Plaintiff demonstrated mild limitations in concentration, persistence and pace.  (R. 14).  Ultimately, the ALJ concluded that Plaintiff's mental conditions were not severe, because they failed to cause more than a minimal limitation on Plaintiff's basic work activities.  (R. 13).

At step three, the ALJ determined that Plaintiff failed to meet any of the criteria of the Social Security Listing of Impairments.  (R. 15).   At step four, the ALJ found that Plaintiff maintained the RFC to perform sedentary work, except that he must "avoid crawling, kneeling, squatting, climbing or balancing on heights."  (R. at 16).  Further, Plaintiff could not operate dangerous machinery or vehicles and could not work in an atmosphere of dangerous machinery or pollutants, such as dust smoke or fumes.  (R. at 16).  He could only use his thumb and forefinger on his non-dominant hand for pinching activity, and not for grasping, manipulating or tasks needing the use of his whole hand.  (R. 16).  In making this determination, the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause his

alleged symptoms, but Plaintiff's statements regarding the intensity, persistence and effects of these symptoms were not entirely credible, because his complaints were inconsistent with his treatment records. (R. 16-21). Further, the ALJ assigned little weight to Plaintiff's treating physician, Dr. Rocchi, because his opinion was inconsistent with Plaintiff's examinations and medical history. (R. 21).

Next, the ALJ determined that Plaintiff could not perform his past relevant work as a meat cutter or butcher. (R. 22). However, considering Plaintiff's age, education work experience and RFC, the ALJ found that jobs existed in significant numbers in the national economy that Plaintiff was capable of performing. (R. 23 -24). Therefore, the ALJ concluded that Plaintiff was not disabled under the Act. (R. 24).

On appeal to this Court, Plaintiff objects to the ALJ decision, arguing that the ALJ erred in determining that Plaintiff's mental conditions — depression and anxiety — did not qualify as severe impairments. Plaintiff also argues that the ALJ improperly afforded less than controlling weight to Dr. Rocchi's opinion as required by the treating physician rule and that the ALJ improperly assessed Plaintiff's credibility. Further, Plaintiff contends that the ALJ incorrectly determined that Plaintiff maintained the ability to perform limited sedentary work. Finally, Plaintiff maintains that the ALJ relied upon an incomplete hypothetical when posing his questions to the VE.

## 1. ALJ's Step Two Findings

Plaintiff's first contends that the ALJ erred in failing to find that Plaintiff's mental conditions – depression and anxiety– qualified as "severe impairments" at step two of the sequential analysis. This Court disagrees.

"Severe" impairment is defined by regulation as "any impairment . . . which significantly limits your physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c), 416.920(c). The ALJ's analysis at step two to determine whether or not an alleged impairment is "severe," is no more than a "de minimis screening device to dispose of groundless claims." Magwood v. Comm'r of Soc. Sec., 417 Fed. App'x 130, 132 (3d Cir. 2008) (quoting Newell v. Comm'r of Soc. Sec., 347 F. 3d 541, 546 (3d Cir. 2003)). An impairment is not "severe" only where the record demonstrates merely a "slight abnormality or a combination of slight abnormalities which have 'no more than a minimal effect on an individual's ability to work.'" Id.

As recently summarized by a member of this Court in Golubosky v. Comm'r of Soc. Sec., No. 13-196, 2014 WL 3943029, at *3 (W.D. Pa. Aug. 12, 2014):

> [i]n cases involving mental impairments, the Social Security Administration Regulations set forth a specific technique for determining whether the mental impairment is severe. 20 C.F.R. § 404.1520a. Under this technique, if the ALJ determines that a claimant's symptoms, signs, and laboratory findings support the existence of a medically determinable impairment, he then must assess the claimant's limitations in four functional areas to determine whether that impairment is "severe." Id. § 404.1520a(b). The four functional areas include: activities of daily living; social functioning; concentration, persistence or pace; and episodes of decompensation. Id. § 404.1520a(c). If the ALJ rates the degree of the claimant's limitation in the first three functional areas as "none" or "mild" and as "none" in the fourth area, he generally will conclude that the impairment is not severe unless the evidence otherwise indicates that there is more than a minimal limitation in the claimant's ability to do basic work activities. Id. § 404.1520a(d)(1). In his written decision, the ALJ must incorporate his pertinent findings and conclusions based on this technique, including a specific finding as to the degree of limitation in each of the four functional areas. Id. § 404.1520a(e). The key question when reviewing the ALJ's Step 2 determination is not whether Plaintiff's impairments were in fact severe, but, rather, whether substantial evidence supports the ALJ's finding that those impairments were not severe.

Here, the ALJ determined that there was insufficient evidence to conclude that Plaintiff's mental impairments qualified as severe. In making this determination, the ALJ found that

Plaintiff suffered no limitations in his activities of daily living and social functioning stemming from his mental conditions and underwent no periods of decompensations. (R. 13-14). The ALJ further found that Plaintiff experienced only mild limitations in concentration, persistence or pace. (R. 14). Therefore, the ALJ determined that Plaintiff's depression and anxiety did not cause more than a minimal limitation on Plaintiff's basic mental work activities.

Substantial evidence in the record relied upon by the ALJ supports this determination. Plaintiff never underwent psychiatric impatient or outpatient treatment, other than two recent therapy sessions just prior to the hearing before the ALJ. (R. 13). During Plaintiff's mental health consultative examination, Plaintiff exhibited a normal thought process, maintained good eye contact, was cooperative and demonstrated normal speech. (R. 13-14, 580-81). Plaintiff tended to his personal needs, performed household chores, shopped in stores and watched television. (R. 13, 236-39). He visited with neighbors and had no difficulty getting along with others, including authority figures. (R. 13, 239-41). He could use a checkbook, count change and pay bills. (R. 14, 238). Plaintiff thought that the Zoloft helped his depression and he himself did not feel that this condition affected his ability to work. (R. 39, 718).

This Court further finds that even if the ALJ had erred in deeming Plaintiff's depression and anxiety as non-severe, any error would be harmless. If the ALJ erroneously determines that an impairment is not severe, but still finds in favor of Plaintiff at step two because of another condition, and continues the sequential the analysis, the ALJ's final determination may be found to be based upon substantial evidence so long as the ALJ considered the effect of the non-severe impairment at steps three through five of the analysis. Sanborn v. Colvin, 2014 WL 3900878, at *7 (E.D. Pa. Aug. 11, 2014); Mosse v. Astrue, 2009 WL 2986612, at *10 (W.D. Pa. Sept. 17, 2009); see also Golubosky v. Comm'r of Soc. Sec., 2014 WL 3943029, at *5 (finding harmless

error when the ALJ determined that claimant's mental condition was non-severe at step two, but proceeded with the analysis and considered the limitations caused by plaintiff's mental condition throughout the remaining evaluation).

Here, the ALJ found in favor of Plaintiff at step two, finding that his physical impairments qualified as severe, and therefore, the ALJ continued the sequential evaluation process. (R. 12). Throughout his analysis of the remaining steps, the ALJ took into account the effects of Plaintiff's mild depression and anxiety. The ALJ considered Plaintiff's mental condition in making his RFC finding by noting that, although Plaintiff reported experiencing suicidal thoughts, Plaintiff had not obtained mental health treatment until just prior to the hearing, and Plaintiff himself indicated that his mental health did not interfere with his ability to work. (R. 17, 21).

Further, at step five, the ALJ took into account any limitations that may have been caused by exertional *and nonexertional* limitations. The ALJ asked the VE if a person of Plaintiff's age, education and work experience could perform unskilled sedentary work. (R. 23). The ALJ relied upon the VE's testimony that Plaintiff could perform unskilled sedentary jobs existing in the national economy, including working as a document preparer, ticket seller and alarm monitor. (R. 23). "Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time. . . . [A] person can usually learn to do the job in 30 days, and little specific vocational preparation and judgment are needed. A person does not gain work skills by doing unskilled jobs." 20 C.F.R. §§ 404.1568(a), 416.968(a). By limiting Plaintiff to unskilled work, the ALJ accounted for any limitations that might be caused by Plaintiff's mental conditions, such as being limited to following simple directions and making simple work-related decisions. (R. 23, 82-85).

Because the ALJ found in Plaintiff's favor at step two, and then proceeded with an analysis of the remaining steps, taking into consideration Plaintiff's conditions, any error in finding that Plaintiff's mental conditions were non-severe was harmless.

**2. The ALJ's Rejection of Treating Physician's Welfare Certification Form**

Next, Plaintiff argues that the ALJ erred by improperly affording less than controlling weight to Dr. Rocchi's conclusion in a welfare certification form that Plaintiff was disabled. The Court disagrees.

It is well-settled that a "treating physician's opinion on the nature and severity of an impairment will be given controlling weight only where it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record." Salles v. Comm'r of Soc. Sec., 229 F. App'x. 140, 148 (3d Cir. 2007); Horner v. Comm'r of Soc. Sec., No. 10-326-J, 2012 WL 895932 (W.D. Pa. Mar. 15, 2012). This is especially true where the physician completes a "checkmark report," which has been held to constitute "weak evidence at best," especially where unaccompanied by a thorough written report. Mason v. Shalala, 994 F.2d 1058, 1065 (3d Cir. 1993); and see, Coates v. Astrue, No. 08-0569, 2009 WL 1514457, at *9 (W.D. Pa. May 29, 2009)(Pennsylvania Department of Public Welfare employability assessment forms not accompanied by detailed explanations or treatment notes are entitled to little weight).

Here, in the January 2012 employability assessment, Dr. Rocchi checked a box indicating that Plaintiff was disabled and would not be able to work for twelve months due to depression, atrial fibrillation and low back pain. (R. 673). The ALJ considered this opinion, along with all of the other medical evidence, and concluded that Dr. Rocchi's opinion lacked the support of any clinical or objective findings and was inconsistent with the medical evidence of record, including

examinations from a pain management specialist, orthopedic surgeon and consulting psychologist. (R. 21-22). Further, Dr. Rocchi's assessment, stating only that Plaintiff was disabled, lacked a specific assessment of Plaintiff's functional limitations and abilities. (R. 21). Therefore, the ALJ appropriately gave little weight to Dr. Rocchi's opinion.

Additionally, substantial evidence relied upon by the ALJ supports the limited weight afforded to Dr. Rocchi's opinion, because his opinion is inconsistent with Plaintiff's medical records. Although Dr. Rocchi found that Plaintiff's mental condition contributed to render him disabled, Plaintiff's alleged debilitating depression and anxiety lacked the support of evidence in the record. (R. 21). Plaintiff's treatment for these conditions included only two therapy sessions and medication, which Plaintiff felt helped his depression. (R. 718). His anxiety and depression did not affect his activities of daily living, and he was able to tend to his personal needs, perform work around the house, spend time with others, shop in stores and take care of his finances. (R. 236-41). Therefore, the medical records do not reflect that Plaintiff's depression rendered him disabled, as Dr. Rocchi opined.

Regarding Dr. Rocchi's finding that Plaintiff's physical conditions rendered him disabled, the medical records demonstrate that Plaintiff denied heart palpitations and his heart condition remained stable with medication. (R. 21, 530, 539, 541). Further, Plaintiff exhibited normal range of motion, extension, flexion and rotation and full muscle strength in his extremities. (R. 658.) He could walk and squat with minimal difficulty. (R. 658). As such, Dr. Rocchi's opinion that Plaintiff's physical impairments disabled Plaintiff was inconsistent with the record.

Because the ALJ is not required to give conclusory opinions of disability controlling weight, and substantial evidence supports the ALJ's basis for affording little weight to Dr. Rocchi's opinion, the ALJ did not err.

### 3. The ALJ's RFC Finding

The ALJ conducted a thorough review of the relevant evidence and concluded that Plaintiff could perform sedentary work, except that Plaintiff must avoid crawling, kneeling, squatting climbing, balancing on heights, operating heavy machinery or vehicles, and working in an atmosphere with dangerous machinery and pollutants. (R. 16-22). Plaintiff argues that the ALJ's RFC conclusion is not supported by substantial evidence because the RFC fails to account for Plaintiff's mental and physical limitations. This argument is unavailing and contrary to the evidence.

"'Residual functional capacity is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).'" Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 121 (3d Cir. 2000) (quoting Hartranft v. Apfel, 181 F.3d 358, 359 n.1 (3d Cir. 1999)); see also 20 C.F.R. §§ 404.1545(a); 416.945(a). An individual claimant's RFC is an administrative determination expressly reserved to the Commissioner. 20 C.F.R. §§ 404.1527(e)(2); 416.927(e)(2). In making this determination, the ALJ must consider all the evidence before him. Burnett, 220 F.3d at 121. This evidence includes "medical records, observations made during formal medical examinations, descriptions of limitations by the claimant and others, and observations of the claimant's limitations by others." Fargnoli v. Halter, 247 F.3d 34, 41 (3d Cir. 2001). Moreover, the ALJ's RFC finding must "be accompanied by a clear and satisfactory explication of the basis on which it rests." Id. (quoting Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)).

Plaintiff argues that the ALJ erred by excluding limitations stemming from Plaintiff's mental conditions in the RFC. While the ALJ considered Plaintiff's depression and anxiety while formulating the RFC, the ALJ correctly found that these conditions are non-severe and any

alleged limitations are unsupported by the evidence of the record.  (R. 20).  "A mental

impairment may require a finding of disability if the claimant's ability to engage in substantial

gainful activity is substantially affected thereby. 42 U.S.C. § 423(d)(1)(A); see Social Security

Ruling 85–28. Inherent in such a determination is a finding that the claimant's mental

impairment significantly limits his ability to engage in basic work activities, including his

abilities to use judgment, respond to supervision, deal with changes in the routine work setting,

and understand, carry out, and remember simple instructions. 20 C.F.R. § 404.1521." O'Connor

v. Comm'r Soc. Sec., 466 F. App'x 96, 101 (3d Cir. 2012).

     In this case, the evidence of record establishes no such limitations and, to the contrary, it

overwhelmingly supports Plaintiff's ability to conduct each of these activities.  Plaintiff's

treatment records show that he can do most household chores, including laundry, washing dishes,

taking medication and caring for personal needs.  He has no limitations in social functioning in

terms of being able to get along with neighbors, family and friends, and he does not need to be

accompanied when running errands. (R. 237-240). Therefore, Plaintiff's mental conditions do

not result in any credibly established limitations, and thus, are not required to be included in the

RFC.

     Plaintiff also argues that the evidence demonstrates that he is unable to perform the

physical requirements of sedentary work, because he testified that he cannot sit and or stand for

prolonged times periods without needing to lie down in a reclined position due to pain.

However, substantial evidence in the record supports Plaintiff ability to perform the physical

demands of sedentary work. Sedentary work "involves lifting no more than 10 pounds at a time

and occasionally lifting or carrying articles like docket files, ledgers, and small tools."

§ 404.1567 "Although a sedentary job is defined as one which involves sitting, a certain amount

of walking and standing is often necessary in carrying out job duties. Id. "[S]itting should generally total approximately 6 hours of an 8-hour workday." Social Security Ruling 83-10.

Dr. Kumar, who completed physical RFC assessment in May 2012, concluded that Plaintiff could stand and walk for about six hours and sit for about six hours in an eight hour work day. (R. 81). He further concluded that Plaintiff could occasionally lift and/or carry twenty pounds and frequently lift and/or carry ten pounds. (R. 81). Dr. Kumar's findings are also supported by Plaintiff's own statements of record. Plaintiff indicated that his conditions did not affect his ability to stand and sit and he noted that he could walk "far" sometimes. (R. 240). He could tend to his personal needs and perform some housework, including washing his dishes and clothes, and yard work, including using his weed eater. (R. 49).

Given this testimony and the medical evidence of record, any limitation requiring Plaintiff to lie down throughout the day was not credibly established to necessitate inclusion in the RFC and the ALJ determination of Plaintiff's RFC is amply supported by substantial evidence. (R. 20).

### 4. The ALJ's Credibility Finding

Plaintiff contends that the ALJ erred in assessing Plaintiff's credibility by failing to find Plaintiff's pain complaints fully credible. Plaintiff testified that he sometimes experienced pain and needs to lie down to reduce the pain. (R. 47, 58). This testimony was found to be lacking in credibility to the extent that Plaintiff's complaints contradict his medical records and own assessment of his activities. (R. 20-21). Substantial evidence supports the ALJ's assessment.

Although the ALJ is required to carefully consider Plaintiff's subjective complaints, he is not required to credit them when they are not supported by competent medical evidence. See, O'Connor v. Comm'r Soc. Sec., 466 F. App'x 96, 99 (3d Cir. 2012), citing Schaudeck v.

Comm'r of Social Sec., 181 F.3d 429, 433 (3d Cir. 1999). Further, a claimant's subjective complaints must be given "serious consideration" whenever the record establishes the existence of a medically determinable impairment that could reasonably be expected to cause the symptoms as described in the claimant's testimony. Mason v. Shalala, 994 F.2d 1058, 1067-1068 (3d Cir. 1993). The mere fact that a claimant may have experienced some degree of pain during the relevant period of time does not necessarily mean that he was incapable of performing work. Welch v. Heckler, 808 F.2d 264, 270 (3d Cir. 1986).

Here, substantial evidence supports the ALJ's credibility assessment. While Plaintiff complained of pain, by his own account, Plaintiff's medical treatment, including steroid injections and prescription medication, alleviated his discomfort. (R. 21, 47, 626, 737). Plaintiff's ongoing activities of daily living are also inconsistent with someone precluded from working because of pain. (R. 20). Plaintiff could tend to yard work with a weed eater, perform household chores and shop for groceries. (R. 20, 236-239). Further, as noted by the ALJ, in early to mid-2012, while complaining of pain, Plaintiff was able to converse comfortably, demonstrate no overt pain behaviors, sit, rise from a seated position, heel walk, toe walk and squat with minimal difficulty and consistently demonstrate a normal range of motion. (R. 638, 658).

Because the ALJ correctly compared Plaintiff's subjective complaints of pain with his medical records, the determination that Plaintiff's statements concerning the intensity and limiting effects of his symptoms are not entirely credible is based upon substantial evidence.

### 5. Reliance on VE's Testimony and Hypothetical

Plaintiff challenges the ALJ's reliance on the VE's testimony, including the hypothetical question posed to the VE, which he contends fail to reflect all of Plaintiff's impairments.

A hypothetical based upon the ALJ's RFC assessment and posed to the vocational expert "may only be considered for purposes of determining disability if the question accurately portrays the claimant's individual ... impairments." Burns v. Barnhart, 312 F.3d 113, 123 (3d Cir. 2002) (quoting Podedworny v. Harris, 745 F.2d 210, 218 (3d Cir. 1984)). To be considered substantial evidence, the vocational expert's testimony must have been based upon a hypothetical reflecting all medically undisputed evidence of impairment. Allen v. Barnhart, 417 F.3d 396, 407 (3d Cir. 2005) (citing Ramirez v. Barnhart, 372 F.3d 546 (3d Cir. 2004)). See also Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987).

Based upon the evidence presented, the ALJ found that Plaintiff could perform sedentary work, except that Plaintiff must avoid crawling, kneeling, squatting climbing, balancing on heights, operating heavy machinery or vehicles and working in an atmosphere with dangerous machinery and pollutants. The VE testified that someone of Plaintiff's age, education, and work experience, who has the ability to perform sedentary work, but who could not crawl, kneel, squat, climb, balance, operate dangerous machinery or vehicles, or work in an atmosphere concentrated with airborne pollutants, could still perform jobs that existed in the national economy. (R. 23, 65). Such a person could work as a document preparer with 25,000 positions available in the national economy, an assembler with about 50,000 positions available, a ticket seller with about 40,000 jobs available in the national economy and an alarm/surveillance system monitor with about 10,000 jobs available. (R. 23, 65-66). The ALJ relied upon this testimony in finding that Plaintiff was not disabled. (R. 23).

Plaintiff argues that the ALJ ignored the VE's testimony that a person who needed to take breaks totaling on hour and forty minutes each day, needed to lie down throughout the day, would be off task up to fifteen percent of the day, and would miss work due to pain, would not

be able to sustain employment.  However, an ALJ is not required to submit to the VE every impairment alleged by a claimant.  Limitations that are not supported by objective evidence or limitations that are medically supported but contradicted by other evidence in the record need not be presented to the vocational expert. Rutherford v. Barnhart, 399 F.3d 546, 554 (3d Cir. 2005).

Because the hypothetical and VE testimony takes into account all of Plaintiff's credibly established limitations, the ALJ was entitled to rely upon the VE's responses as substantial evidence for his step five determination.

**E. Conclusion**

Summary judgment is appropriate when there are no disputed material issues of fact, and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56; Edelman v. Comm'r of Soc. Sec., 83 F.3d 68, 70 (3d Cir. 1996).  In the instant case, there are no material factual issues in dispute, and it appears that the ALJ's conclusion is clearly supported by substantial evidence. For this reason, it is recommended that Plaintiff's Motion for Summary Judgment, ECF No. 12, be denied, that Defendant's Motion for Summary Judgment, ECF No. 14, be granted and that the decision of the Commissioner be affirmed.

In accordance with the Magistrate Judges Act, 28 U.S.C. § 636(b)(1), and Local Rule 72.D.2, the parties are permitted to file written objections by December 19, 2014.  Failure to timely file objections will waive the right to appeal.  Brightwell v. Lehman, 637 F.3d 187, 193 n.

7 (3d Cir. 2011).  Any party opposing objections may file their response to the objections within

fourteen (14) days thereafter in accordance with Local Civil Rule 72.D.2.

Respectfully submitted,

/s/ Maureen P. Kelly
MAUREEN P. KELLY
CHIEF U. S. MAGISTRATE JUDGE


Dated:  December 2, 2014


cc:      All Counsel of Record via CM/ECF